2-25-0055 The Miramar Athlete LLC in Robert County takes its athletes and cross-athletes to the Wells Fargo Area Services LLC in the business of archery and boxing with Stephen Hector of Commendments. Stephen Hector of Commendments Accounts and Cross-Athlete. I bring on behalf of the Accounts and Cross-Athlete, James Henry, Jane Conrad Askin. I bring on behalf of the Athlete and Cross-Athlete, Mr. Glenn, and Mr. Jeff. Good morning folks. You may proceed. May it please the Court. Counsel. My name is Amy Kanarowski, and I represent the appellate, cross-appellee in this matter, Stephen Hector. By this appeal, Mr. Hector seeks two forms of alternative relief. First, a new trial based on prejudicial errors during the conduct of the trial, and also for the remitter of the punitive damages award. I'd like to start with the arguments regarding Mr. Hector's request for a new trial. As set forth in our briefs, there was a large swath of evidence that was relevant to the claim of defamation made by the plaintiff in this case that was excluded erroneously from the trial. And the prejudicial effects of that exclusion of evidence led to the jury verdict that we are here to discuss today. I would like to start with what happened during the plaintiff's case in chief. Mr. Hector was called as an adverse witness. Let me stop you right there, Ms. Kanarowski. I'm going to take you to the prejudice. My reading of the record and of your opponent's briefs point out that a lot of the information that your client believes was not presented or he was not allowed to present actually came in at different times. How did he get – how was he prejudiced? So that argument is inaccurate. Mr. Coleman's brief recites nine bullet points of evidence that he suggests was admitted that would have cured the prejudice, one of which is – and I have a hand up if it would help, Your Honors – one of which was an e-mail. May I approach? Yes, sure. This is the e-mail that the defendant sent to Zell, right? Yes, Your Honor. Yeah. Mr. Utah, you have a copy of this. I will give you one. Thank you. So the very – Let me just – consistent with Justice Chauster's question, just be reminded that the exclusion or admission of evidence does not require a reversal unless the party appealing has been prejudiced and the result of the trial was materially affected. That's the hurdle you have to get over. Correct. We agree. So the very first page that I handed up, that's Defendant's Exhibit 10 as admitted by the court. Defendant's Exhibit 10 is an e-mail from Mr. Hefter to Ms. Zell. It was attached to the complaint as an exhibit. The second document that I handed up is Exhibit 10 as it existed in its true form, as the e-mail was sent from Mr. Hefter to Ms. Zell. There was a motion limiting regarding this e-mail. That motion was denied. The trial court judge ruled that it would come in. It was introduced into evidence. It was admitted. It was received. And after the close of evidence, the trial court judge redacted out the graphic. There's no dispute that the graphic in this e-mail is accurate. It is true. That redaction caused an incomplete conversation to be submitted to the jury because the third paper in the pile I handed up to your honors is Ms. Zell's response. And Ms. Zell calls out Mr. Hefter for being inaccurate in his e-mail. So the jury – now, the jury in this case wasn't presented binders and binders and binders of documents like in some cases. We're dealing with a stack of evidence that's maybe a half an inch thick. So the jury had in its possession the Exhibit 10. It doesn't even indicate that it's been redacted in any way. If you didn't know that this graphic was on here, as the jury didn't, they would have no way of knowing that what Mr. Hefter had attached to his e-mail was an indisputably accurate graphic. Now, Ms. Zell responds to Mr. Hefter's e-mail and suggests that he's lying about the contents of the graphic. Well, there was testimony that he was with firms that were – that he was with firms that had done some untoward acts. But he – I think what the court was saying that that was not him, correct? So the court excluded that evidence based on the court's ruling that there was no substantive proof that Mr. Coleman had caused the delisting of the firms. But the situation is here is we have a defamation case, right? And so the tort of defamation is about reputational damage. So once that tort is raised, anything that goes to the plaintiff's reputation and character should have been admitted. And here we had Mr. Hefter, who was disallowed from explaining why this graphic, the contents of it, were so concerning to him. The concept that Mr. Coleman, in his career, had been with three firms that were delisted by – delisted by FINRA is unusual and is, in and of itself, concerning. How does that – how does that go to the merits of the defamation? It goes to the merits of the defamation because – Because what? Because the – Nothing about defrauding investors. So the first rule itself says, I have some concerns about his record. And it – And he said he defrauded investors in the past. He had some concerns that he had defrauded investors, and that was on his record. He said he defrauded. He didn't say he had concerns. He said he defrauded investors in the past. And he also said, I don't know much else but what's in the findings. I think, you know, you're missing the forest from the trees. He said, as a fact – as a matter of fact, he's defrauded investors in the past. If he were allowed to introduce other evidence that did not touch Mr. Coleman, other than the fact that he was at one time associated with this firm or these firms, the prejudice – and we would – even if we disagreed with the trial court, we would have to find that no reasonable person could agree or no reasonable jurist would agree with the trial court. So the prejudice here is not just the tort of defamation, which we maintain that anything about Mr. Coleman's reputation, an investor could have found this. But here we had a claim for punitive damages. And the jury was instructed, as they should have been, pursuant to the Illinois pattern jury instruction, that the key factor in determining whether punitive damages were appropriate was the reprehensibility of the defendant's conduct. And they were supposed to consider all the facts and circumstances surrounding the defendant's conduct. One of the big facts in this case was the size of the fund that Mr. Coleman was managing for Ms. Zell. And it was $20 million, right? I believe there was a stipulation. I don't know the reason. It was testimony. The plaintiff, Mr. Coleman, testified that it was $20 million. There were – my understanding – and I wasn't the trial court attorney. I'd like to your honors, I came into this with the trial court record. I came in after the trial. There wasn't evidence presented at the trial regarding the performance of that investment, how it had gone over the years. And the evidence that came in was clear. After the voicemail, Ms. Zell continued to be Mr. Coleman's friend. She continued to do business with him. This is a defamation case with a single publication to a single person who there's no evidence that she lost any – that she bore any ill will towards the plaintiff as a result of this voicemail. Are you talking about the reprehensibility or are you back talking about the trial court's ruling? I was answering the justice's question. But as to the reprehensibility, everything should have come in. I'm not sure you can get to that. Correct. I'm still – I'm concerned that you're allowed to go into the fact that Kurt Scherr has been barred from securities, disciplined, and he was plaintiff's partner. There was regulatory discipline and litigation. All that came in. So I understand you're saying, well, look, the graphic. The graphic would have been so important, but was it? But isn't that all this stuff came in other ways? So the litigation against Mr. Coleman did not come in. You mean the Braverman? The Braverman litigation was excluded from trial. The DirecTV litigation was excluded from trial. The history of Mr. Coleman litigation or, you know, regulatory action concerning Mr. Kirshner. We were allowed to say at trial that his long-time partner had had regulatory issues and had been barred, and we're allowed to present specific evidence of that. Now, actually what occurred is that Mr. Hefter was informed by Ms. Zell that she was thinking of going with Mr. Coleman. And when Mr. Hefter did research on Mr. Coleman, he found that on the day he did his research in December of 2018. No, I get it. I understand. And he attached it to the email, and he sent it to her, and he said, now I'd like to discuss why I would be a better choice to advise you. But my issue is how did the redaction of the attachment prejudice you? Because the exhibit allows you. It would have been better. It would have been better, more graphic for the jury. And the conversation went in exhibit 10, exhibit 11, and then there's another exhibit. It's a continuous conversation. So once the conversation was admitted into evidence, the entirety of the conversation should have been admitted into evidence because Ms. Zell responds to Mr. Hefter and suggests that he's lying about what's on Mr. Coleman's publicly available broker check. And the jury got that email as a part of evidence and did not have any way of knowing that there was a graphic attached and that the graphic was accurate. And when the email was introduced, Mr. Hefter was prevented from testifying to it, wasn't allowed to present the evidence about these D-listed firms. It did not come in. So the jury was presented with a conversation that they didn't have the entirety of and were presented a misrepresentation of that conversation. The Schmidt case says that once you allow a conversation or a document into evidence, the whole thing has to come in because everybody should be allowed to make arguments about the entirety of the context of that conversation. You mentioned in your brief that Ms. Zell did not testify, but the defense could have called Ms. Zell. Yeah, the defense could have called Ms. Zell. Again, I wasn't at the trial. My understanding is there was a subpoena issued to her. I'm not sure why that wasn't enforced. I can't speak to that. In any event, the jury knew what the conversation was. The jury knew part of the conversation because part of the conversation got put into the record but not the entirety. So back to the question about how were we prejudiced, you're going to hear from my opposing counsel that Mr. Hefter's motivation and reasoning for leaving this voicemail is a significant factor for why the punitive damages award as remitted is inappropriate and why it should go back to $2.5 million. Since you're there, let's talk about the reprehensible factors. We'll bring you back to that because you're running out of time. So the factors for reprehensibility under Illinois law require showings of things like fraud, actual malice, an intent to cause physical injury, those kinds of things. It's akin to a criminal action, right? Can we have one voicemail? You only need one of those factors, correct? You only need one of those. Under Illinois law, yes, and we can talk about the two tests. There's the Illinois test and then there's the constitutional test. We can all agree, I think, that in the financial advising world and portfolio management, reputation is everything, right? Correct. And it's clear from the record in this case that Wells Fargo was trying to get Zell's business or manage her wealth, $20 million, just at page 641 of the record. At one point, yes. By the time of this voicemail, Mr. Hefter's office had determined that Ms. Zell was no longer interested, and Mr. Hefter wasn't the person responsible for that business organization. He's a more senior member of that staff. But he was aware of it. He was aware of it. So it made him aware of the fact that they didn't get to Zell's business. That's correct. He wasn't returning their calls. That's correct. He was aware of that, yes. Why would he even call her? Just out of the blue, he ends up doing an investigation into Collin's background? No, they're so sure. They saw each other at a funeral. Right. She basically called him. I mean, the gist of it is that she told him, go on with somebody else.  And he was not aware of Mr. Collin? It wasn't somebody he knew? Well, he didn't trust that she had the intelligence to choose a good investor, a good manager, a good wealth manager? No, it's not that he didn't trust her intelligence. It's just that somebody comes to me asking for advice for a lawyer and says, I'm going to pick somebody. I may be a little bit better situated than even my most intelligent friends at assessing whether somebody's a good fit for them or not. The jury didn't see it that way? No, the jury didn't see it that way. Right. No. There were 20 million reasons to make this statement to Ms. Zell. Right. But the jury also wasn't allowed to hear all of the things that Mr. Hefter saw that explained why he said, I have concerns. I have concerns about what I saw. And you're saying that all of those statements that were precluded, or the gray women's suit or the direct TV suit, would have had an impact on the punitive? Exactly. Exactly. Because the jury was instructed, as they should have been, that you're supposed to consider all of the facts and circumstances surrounding the conduct. And so when you preclude evidence as to the facts and circumstances surrounding that conduct, that's going to prejudice the defendant when punitive damages are sought. So the acts and circumstances you're talking about are what motivated Mr. Hefner to make those comments. Correct. And he should have been, you know, I recognize my time is up. He should have been permitted to explain to the jury what it is he had seen that caused him to have concern before he reached out to Ms. Zell. Anything further, Justice Newman? Well, I just, as your point is, his motivation was concern for her. That's his testimony, yes. You know, even though the email says, call me so I can, we can discuss how I would be a better advisor for you, that suggests self-interest. And I think we've caused some confusion, for your honor. That's a red line that we created of the voicemail. He didn't say that in the voicemail. He didn't say, call me to see how I would be a better advisor for you. What he said is, I have some concerns, and I think you should call me so we can discuss them. Oh, I see. Yeah, yeah. We added to that. I apologize for that confusion. That's our, we caused that. But the voicemail itself does not say that. It says, I have some concerns. I can only tell you what I'm seeing in these filings, and here's some questions you should, but then there's an email that says, here's some questions you should ask your broker. That's what he said. So he should have been allowed to tell the jury what those concerns are, especially since, you know, he was being under the threat of punitive damages. And we wound up with a situation here where we have 100,000 in presumed damages, and the jury attempted to award 2.5 million against my client. And I don't represent Wells Fargo, but the punitive damages award against Wells Fargo was 25 million. Reduced. It was reduced after the post-trial motions. The judge issued a perimeter, and it reduced the punitive damages to 1.1 against Mr. Hefter and 1.1 against Wells Fargo. Anything further? No, thank you. Thank you. Thank you so much. Counsel. Good morning, Your Honors. Good morning. May it please the Court, my name is Glenn Udell, and I represent the plaintiff, appellee, and cross-appellant Robert Kelman. Warren Buffett, the famous investor, once observed and said that it takes 20 years to build a reputation, which you can lose in five minutes. And if we all recognize that, we might live our lives a little differently. This case is all about that. This case is all about reputation. Stephen Hefter, who professed to be the number one financial advisor in the state of Illinois, who ran an office out of Highland Park, Illinois, in an effort to steal a client from my client, Robert Kelman, called and left a voicemail for Rick Gazelle saying, your guy defrauded investors and has it on his record in the past. He did not qualify that statement. He did not say, your guy worked with firms where other associates had defrauded investors, or your guy worked at other firms and those firms were sanctioned by FINRA. He didn't say any of that. He chose his words. The trial court was well aware and admonished Mr. Hefter and his counsel repeatedly. And I was at trial. I did try this case. But he chose his words. They were not words of qualification. This was not negligence in what he said. This was an intentional statement. He knew what he said. He claims he had an undergraduate degree from Stanford, an MBA from Harvard, makes $5 million a year, at least $25 million of net worth, and then somehow miraculously at some point claimed in front of the jury that he forgot he made that statement to a customer of my client who was a competitor of his. Nobody believed him. Do we know how much time passed between the voicemail and the email to Zell? It was a pretty short period of time. I think this all occurred, well, him courting her as a client occurred over several months. And then when he finally got the associate at his firm engaged to try and set up meetings and get Ms. Zell involved, I think that was all inside a month that that all happened. So let me understand what you're saying. I know you're saying that this was an intentional statement, was a statement saying, you know, this guy, Kalman, is a bad guy, basically.  So why is it then, or are you saying then the fact of the Waverman lawsuit and the DirecTV lawsuit then should not have been relevant at all in light of the fact that he didn't say he was associated with these people or he's done bad things? I guess my question is why do you feel that those weren't relevant here? Well, I'll tell you why I felt it and I'll tell you why the trial court felt it. Because the Waverman lawsuit, there was no allegation of fraud, none. And in the DirecTV lawsuit, there was no allegation of fraud. That was a statutory complaint based on a federal statute regarding allegations of where a company bought en masse thousands of claims from DirecTV where DirecTV believed that consumers were pirating their signal. And that was a case that was over 20-plus years old. There was no judgment entered in the case. There were no findings of fact in the case. The Braverman lawsuit was a lawsuit filed by Mr. Braverman, who was a former customer of Mr. Kalman, who lost value in a privately held bank stock that emanated out of the 2008 financial crisis. The case was dismissed on a motion to dismiss three times. And then Mr. Kalman's insurer decided to offer a de minimis amount of money because the legal fees to file another motion to dismiss exceeded the amount of money that Braverman and his counsel were willing to accept, which was under $20,000. And so the judge saw that. Wouldn't that be relevant in light of the punitive? How? It's like the trial court said numerous times to Hector and his counsel, if you bring me any evidence whatsoever, anything that shows Mr. Kalman committed fraud on anybody, let alone in the context of representing and managing money or in society as a whole, if you can bring me anything that shows this guy committed fraud, I will allow it into evidence. But you don't have it. And what you're trying to do is introduce fraud from Mr. Kushner. And the judge used the analogy when we were at trial arguing this. He said, if I work at a big law firm in Chicago and the managing partner of the firm is found guilty of committing fraud and I'm at a trial, does that mean you can associate me with that fraud because I worked at the law firm? So the judge said, no, that's way too prejudicial, and it's not prerogative at all into whether or not the statement that Kalman defrauded investors in the past was true or false. Right. I appreciate that. I appreciate that, and I agree with that. But my question is if it's something directly related to Kalman, like the Braverman case, why was that not relevant to punitive? Because, first of all, the Braverman case did not involve fraud. It was an allegation in a complaint that had been dismissed three times. But they settled. And they settled. But there was no finding of fact. There was no judgment. There was no trial. And there was no allegation of fraud, and even from Braverman, who was the plaintiff in that case, he didn't allege Kalman committed fraud. So the judge said, how can I let this in? It's still evidence of prior fraud by Mr. Kalman, and it's way too prejudicial, and his probative value doesn't go to whether or not the statement was true. They were trying to show what Heffer thought in his head somehow might have justified him making the false statement. So they were trying to show a trial through other things, maybe what his state of mind was. And the judge said numerous times, the trial court said, Mr. Heffer said what he said. He didn't qualify his statement to say, oh, Rivka, by the way, I read some articles online about Mr. Kalman, and I read a lawsuit that Braverman filed, and I read this DirecTV lawsuit, and you should call me so we can discuss what these things might mean as far as Mr. Kalman being your financier. He didn't say that. Was it ever established whether he even knew these things prior to speaking to her? No. It was not. Does it matter? No, it does not, because he didn't qualify his statement. So if he had called, and again, he could have easily, this is a smart guy, okay? We're not talking about someone that can claim, I didn't know what I did, which he tried to claim for the jury. He tried to claim, I didn't think this was bad or wrong. His employer tried to claim, we didn't think what he said was wrong. And the jury, I mean, their testimony was so incredible that they got hit with, well, it's $25 million in punitive damages. It's the largest defamation punitive damage award in Lake County history. And the punitive damage award against Hector tells you how much the jury did not believe this guy. They did not believe what he was saying. They knew that he went, he was trying to poach a customer, and he was willing to say and do whatever it took to try and get the customer. This is corporate greed by Mr. Hector. This is wanting to aggregate more into a money management firm that earns, you know, a percentage of what they manage as far as how much money he earns per year. He was trying to aggregate more money. And we all saw it, and they tried to deny it. They tried to claim that's not what we were doing, that he really cared and felt for Riv Gazelle, someone he barely knew, was just an acquaintance of his from prior Jewish charities that they had met at. Let me ask you, with respect to the completeness doctrine. I'm sorry, I didn't hear you. With respect to the completeness doctrine, was it appropriate for the trial court to not allow the attachment to the email? Was that attachment actually part of the conversation? So with respect to, I don't think that that's reversible error. With respect to what Hector did testify to, the trial court allowed Hector to testify as to plaintiff's association with Kushner. He allowed Hector to testify as to his knowledge of the plaintiff being at a firm where Kushner committed fraud. That was allowed for Hector to testify to that. And that that firm was borrowed from FINRA. So Hector testified that Kelman was at a firm that Kushner worked at that was borrowed by FINRA. He was allowed to read the record of the plaintiff that he had been at firms that had been accused of fraud and expelled by FINRA. He was allowed to testify that Kelman had been sued by a public company, i.e. DirecTV. He was allowed to testify that he had concern with things besides the fraud with respect to Mr. Kelman. He was allowed to testify as to his concern with Kelman being a former partner of Kushner who was accused of fraud. Hector saw things on plaintiff's record not involving fraud that he was allowed to testify to. But why isn't that relevant with respect to the punitive? What do you mean? I'm saying that he, the jury heard all that. My point is even though the trial court may have erred in striking that. I see what you're saying. In striking a portion of the email, the jury heard a voluminous amount of evidence of the word fraud in relation to associates that Kelman had worked with, firms that Kelman had worked with, and then Kelman. That was all argued during the trial. Ad nauseum. Ad nauseum. That was their whole case, was trying to leapfrog a deceased Kushner's prior allegations of fraud in firms that he had worked at onto the back of Kelman. But again, the jury saw through it and so did the trial court. When the trial court repeatedly told Hector and his counsel he didn't qualify his statement. He chose his words. His words were an affirmative statement of fact that Kelman had defrauded investors, past tense, and had it on his record. Both of which were not true. There was not a shred of evidence to prove that that was true. And the jury made a determination that that was a false statement. Do you have a question? Well, can you address the reprehensibility factors? Yes, I'd love to address the reprehensibility factors. So the State Farm case, the International Union case, and I believe Mathias all talk about reprehensibility. I think Mathias is the case that is really directly on point with what's going on here. So the Mathias opinion, as you know, was the Seventh Circuit opinion offered by Judge Posner. I think we can all agree that Judge Posner was one of the most respected jurists. His reputation is not at issue. No, you're correct. But he was famous for economic injury, tort cases, and he was revered as a jurist that analyzed them in a pretty skilled manner. The court in the International Union case, which is an Illinois Supreme Court case, agreed with the Seventh Circuit's observation and Posner's observation in Mathias that at times low compensatory damage awards do not always do the trick, and therefore a higher ratio of punitive damage awards can be warranted when you've got egregious conduct. In this case, you have reputational injury, dignitary harm, professional disruption, and intentional misconduct. And with respect to the reprehensibility, and this is important because they talk about it in Mathias and International Union, and they talk about it in the State Farm case, the kind of recidivism rate of the conduct or the statement. So what did Heffer do to perpetuate the nefarious nature of what he did? So he made the statement without any knowledge that it was true. That was bad. It came out at trial that he refused to retract the statement when asked to retract the statement. It also came out at trial, he denied ever making this statement to his employer. Then his employer conducts an investigation and he submits forms under oath and in writing denying that he ever made the statement. When asked at trial, why did you deny making the statement both orally and to your employer, he said, I forgot I said it. I forgot. And at that point, that was an inflection point at trial because I was standing there and you could see the jury looking at this. Nobody believed him. Nobody believed this Stanford undergrad, Harvard MBA, high net worth guy forgot he called a customer and made a statement to try and steal her business. Nobody believed him. And he didn't apologize. Never apologize. And when asked at trial and it's on the record, why didn't you apologize, he said, I didn't know I could. Let me ask you this. The defense, the appellant talks about in their briefs Slavinski and O'Rourke cases. How do you distinguish those cases? Because in those cases, it seems like especially to me and Slavinski, you can understand why a lot of the statements were really offensive. What they said about this individual and the Supreme Court in both of those cases say, no, not enough there. Correct. Well, so I think Slavinski and O'Rourke are extremely distinguishable. And so did the trial court in this case. So first of all, if you adopt their reasoning, they would say that if Slavinski is the law of the land, you could never get more than a one-to-one ratio of punitive damages in the state of Illinois. That is not the law in Illinois. Slavinski is a thin record remitter decision more than it is a decision that places a cap on punitive damages. So Slavinski arose from a default judgment, an exceedingly sparse damages record, only the plaintiff's testimony and minimal corroboration, and the Supreme Court therefore reduced the punitive damage to the highest amount that the record could support in that case based on no set of facts. That was an ex parte default judgment with no testimony of the defendant's net worth. In this case, we have a several-day jury trial. We have live testimony. We have stipulations as to the defendant's net worth. We have credibility issues that a jury looked at. And we have the reprehensibility factor that a jury believed this guy was a liar. He was a bad guy. This was about corporate greed trying to steal a client. And even if there was no actual harm to your client, the nature of that accusation in this industry carries a lot of weight and can be devastating. Yeah, and that's why there's presumed harm when you have a per se category of defamation. And the jury did believe that he was harmed and that, you know, the judge ultimately entered an order with $100,000 of presumed damages harm, and the trial court recognized that subsumed within the presumed harm is emotional distress, the fear that your reputation could – that's all included within the presumed damages. And the ratio from the Mathias case, which was upheld in international union case, was 37 to 1. The ratio of Mathias was 37 to 1. The trial court in this case used all the reasoning from the Lowe case, adopted all the reasoning from Mathias, and then just said, I believe mistakenly, that I'm just going to use the 11 to 1 ratio from the Lowe case as a bright line rule, and I'm taking this and just doing 11X. And when I asked him at the post-trial motion, how are you coming up with 11X, his response was, counsel, I've never dealt with this before. I've never – and he's been a judge for a while, and I think he's a fair judge. I've never done this before. I've never dealt with remitter, and I just figure if I follow the guideline of 11 to 1, I'm following what the Illinois Supreme Court told me was okay on the set of facts that are, I'll say, probably not as bad as this. So he just used it as a bright line rule, but the Mathias case is clear. When you've got a David B. Goliath situation, you've got a big corporate defendant versus the smaller money manager, and they use their wealth, which the judge, if you look at his written opinion in this case, said they clearly did. They litigated this case for five years. We went through discovery disputes over nothing. I mean, this case was litigated ad nauseum. This is exactly what Posner was warning about in Mathias. If you make it cost beneficial for large corporate defendants to commit bad acts, and you can't punish them for doing it, they're just going to commit the bad act and pay the crime or pay the fine because they don't care. They have the money, and it's worth their while to just pay. Thank you. Any further questions? If we find the remitter is proper, then do we need to address your arguments that you want the original? Correct. Thank you. Thank you. Thank you, Your Honor. Ms. Canerowski, then you'll get another opportunity. Yeah. I'd like to start by addressing a few points. Sure. There was some conversation about the gap in time between the voicemail and the e-mail. The voicemail was on December 6th. Ms. Zell's e-mail complaining was on December 31st. So several weeks had gone by between the time Mr. Hefter left the voicemail and the time Ms. Zell sent the e-mail. Now, Ms. Zell sent her e-mail to Mr. Hefter on December 31st, New Year's Eve. I believe it was the afternoon. And Mr. Hefter immediately, the very next day on New Year's Day, reported to Wells Fargo what had happened. And he did indicate, as counsel suggested, that he didn't make the statement about defrauding investors. The testimony was he didn't remember that he had said it in his voicemail. And several weeks had gone by at that time. I want to make sure it's clear. He didn't deny leaving a voicemail. He forgot that he had used that phrase. And this was a voicemail. Mr. Hefter is an intelligent individual, but he called somebody, got a voicemail, left a voicemail. We've all had that experience where you've been at a hearing, you've been at a deposition, you've been at whatever, and you're sure something happened, and you get the transcript, and it isn't exactly what your memory was. So there was some time it wasn't like it was the next day. But the facts here could encompass a scenario where the jury didn't buy that. That's correct. And you're not asking us to rule, well, then, he must have forgotten. No. So the jury was wrong to say or to infer. No, I'm not at all, Your Honor. I'm just suggesting that it wasn't immediately the next day, and someone had asked about the passage of time. So I wanted to use that. I hear what you're saying, but I guess you're kind of asking us to make that assumption as you move through your arguments. So the other thing I'd like to point out about the voicemail is there's a lot of talk about how it was unequivocal and not conditional and all of that. The very last sentence is I don't know that that's the situation because I don't know much more than what the filings are reported about what was done in the past. But I'm concerned enough that I would appreciate that you give me a call. So he did say, you know, I looked at some things. I looked at some things, and that's where my concern is coming from. So I just wanted to address that point. I'd like to talk also about the litigation, the Braberman litigation. There were allegations in that case of willful misfeasance and gross negligence. And that was something that was alleged, and to the point that the arguments made by counsel today are all things that could have been made at trial about how the jury should weigh that evidence. Does it have to be, did it have to allege fraud in order for it to be admissible? Well, for two reasons. One, as we've discussed, punitive damages are all about reprehensibility, right? So here we have a situation where Mr. Hefter went and looked at some things. It caused him concern. He left a voicemail. The evidence that was left out are the things that caused him concern. So it should have come in for that reason. And secondly, under the jurisprudence, defamation doesn't require that exact one-to-one symmetry. If the sting of the statement would be the same as if it were said exactly correctly, that's not defamation, right? So that was a jury question, and the jury should have been entitled to hear that Mr. Hefter had heard about willful misfeasance and gross negligence when he said concern about defrauding investors. And then they should have been the ones to determine whether the sting was the same or not. So it should have come in for both of those reasons. Wouldn't it be relevant whether or not he knew of the Braverman lawsuit prior to calling her or learned of it subsequent to? It would have been relevant. My understanding is he did know about it when he called her. That's the – because it was excluded at trial, there was a limited offer of proof given that this wasn't something that was, you know, held into, and Your Honor is exactly correct. That's something that could have been explored, and there were arguments to be made about it. Was that an inoffer of proof? That he knew about it? That he knew about it at the time of the phone call. I don't recall. If it were, that may have changed the trial courts. Right. It may have. I believe it was, but, you know, I don't have that record memorized, that portion. I believe that's the case, but I don't want to misspeak to the panel here today. I'd like to talk about the cases regarding defamation. The Stavinsky case, we argue that the facts of that case are very similar to the facts, and we think that the effort to distinguish it based on the procedural posture aren't sufficient. The decision itself talks about the facts being a limited duration, a limited scope of the audience, limited harm. And then the Lawler case, which is decided, I believe, within a year or so of Stavinsky, picks up that reasoning, and it's not. Lawler isn't a defamation case. It's an invasion of privacy and an inclusion upon seclusion, an intrusion upon seclusion case. But the Illinois Supreme Court relied on the, pardon me, the reasoning of Stavinsky about the damages in that case to suggest and to find that a one-to-one ratio was all the facts there could possibly support. And we suggest that that's the situation here, that the highest amount of punitive damages that the facts here could support is that same one-to-one ratio. And that aligns with the jurisprudence from the United States Supreme Court that suggests when you get up to, when you get to double digits, there's going to be very, very few cases that support a double-digit ratio of punitive damages. And when you start getting to four times the actual damages, you're approaching a constitutional line. Counsel brought up a very good point, is that what is it that is going to deter some big company who's worth millions and millions, what's going to deter them from doing something like this? I mean, that's just the cost of doing business, a million, 1.1. So the wealth of the defendant is a factor that gets considered, but the most important factor is the conduct. You have to first have conduct that's reprehensible, and then you can look to the wealth of the defendant, and the Mathias case says that. Like, if you go on the wealth of the defendant, you're punishing status and not conduct, and that is completely unconstitutional. So we also have to consider the facts of Mathias. Mathias was about bedbugs, and Mathias was a case where the plaintiffs were repeat litigators. They operated a chain of, you know, back in the old days when we weren't called flophouses, right? They were, and they were infested with bedbugs. And the plaintiffs in that case knew they were infested with bedbugs and repeatedly rented them out. And in that case, the plaintiffs had been bitten by bedbugs and fortunately did not have significant damages, and they were capped at a statutory damage of $5,000. So that multiple, that 37 to 1, we have a situation where you have $5,000 in punitive damages, so the punitive, I'm sorry, $5,000 in compensatory damages. So the total award there was less than $200,000. And the same is true with the low case, that 11 to 1 ratio. That was less than $5,000, and you had a situation there where there was repeated picketing with knowingly false statements on them and the same arguments about, oh, my gosh, we could have lost a lot of business because of this. And the court said, well, that's not the kind of vulnerability that's one of the factors for determining whether punitive damages are available. The fact that you could have lost business as a company is just not enough. So is there evidence in this case of intentional premeditated scheme? They're submitting that there was. They suggest that there was. They suggest that this was premeditated to steal her business. To steal her away. Right. But is it fair to distinguish Slavinsky and Lawler in that in both of those cases, it seemed like the court was saying, well, look, you know, they overdid it, but they had a legitimate, they could fire the guy. And with respect to the other case, I think the employee had left and they had surveilled.  And they had a legitimate interest in doing that. And so it seemed that the court viewed that as mitigating. Is it fair to say there's a distinction here because somebody, you know, was accused of going out of their way to accuse a business competitor of a crime or moral turpitude for no other reason than profit? Right. And herein is the problem in that they are obviously permitted to make that argument and to suggest that that's what the evidence supports. But if that's the argument that's going to be made, Mr. Hector should have had a full and fair opportunity to present all of the cross evidence and let the jury decide. But I'm talking right now about the punitive damages. Right. And the problem we have here is we've got a record that. . . I see those as two separate things. Right. And I don't. . . Unfortunately, I don't have. . . Why is it excessive and reprehensible to have these evidentiary issues? I'm not going to throw them into a pot and stir them around. I'm going to analyze those issues separately. So is it fair to make that distinction between Slavinsky and Waller in this case? I don't. . . And I think so in that in Slavinsky the defamatory statements were made by the owner or the CEO of the company that Mr. Elliott had. . . At a private. . . At a board meeting, was it not? It was not. In justifying the firing? No, no, it was. There were suppliers to the company that had come in. The company sold minutes for cell phones, and a supplier for those minutes had come in, and the contract required that supplier to be able to view the financials of the company. And when the financials weren't made available to them immediately, they asked why. And the CEO threw Mr. Slavinsky under the bus and suggested it was all his fault, that he hadn't done his work, that he was out all day. And the words that were used were such that I didn't even want to write them in my brief. So that was an attempt to, in that case, the argument was to save off the bankruptcy and save the CEO's job. And I understand my time is up. If I could talk about Waller.  Waller was a case where they were concerned about a restrictive covenant, and they were investigating that, but the people they hired posed as the plaintiff and got her personal records. I mean, there was some pretty egregious activity there, and the Illinois Supreme Court still said, look, this was limited in duration. There's not a history of this going on and on and on and on. They said they could have gotten the phone records another way. And the way they did it was not appropriate. So I do think that they can be distinguished, and I think it's notable that in both those cases the Illinois Supreme Court said the facts can only support a one-to-one ratio. So our argument would be that that's the highest that should have happened here. I have another question. You argue in your brief that any liability alleged as to Wells Fargo was derivative of Hester's liability, and therefore plaintiffs should only be permitted to a single recovery. Do you have any authority for that argument? We have authority as to compensatory. I'll tell you, we searched high and low for a situation like this where you had two defendants with the same conduct with the words of purity of damages. But you've got two actors. You've got Wells Fargo and you've got Mr. Hefner. You've got two actors. Right. But the argument here was it was completely derivative of. Well, not completely. Not when you think about Wells Fargo's handling of the complaint. They put their stamp of approval on it. Right. As pled, it was a respondent superior, right? So it was you're liable for the conduct of your agent. So we looked for authority. We couldn't find it. And I don't know that we'll ever see a case. You should be making arguments that have no authority, though. It's a common-sense argument? Is that what you're saying? That's what we're saying. And we're not asking that that's a statement we made. We're not asking the courts to reverse on that ground. We're not. Because we recognize that we don't have, you know, we couldn't find authority for it. Thank you so much. Mr. Udell. Thank you. Sure. So if you buy into their argument, they're saying that there's no circumstance in the state of Illinois where you could ever have a punitive damage award that goes beyond a one-to-one ratio of compensatory damages. I would submit that's an absurd argument. That would render punitive damages meaningless under Illinois law. Who would care? People would do anything. Big corporations would do anything, no matter how bad the conduct is, as long as there's not some statutory violation that allows for trouble or some sort of statutory damages, the money will always justify committing the bad act. Always. That can't be the law. How they can expect this court to adopt that line of reasoning, to me, is just insane. The low court … But the one-to-one ratio for one company is going to be different than it would be for … Of course. It's all fact-specific on the conduct, the reprehensibility, the net worth of the defendant, what happened. Right. Of course that all has to come into play. So the court in International Union took note again of the observations from Mathias, where it pointed out that compensatory damages do not always do the trick in cases where harm is largely dignitary because these damages may be too slight to give the victim incentive to sue and are sufficient to deter and punish the defendant, meaning large corporate defendants. The court further noted that an award of punitive damages can often prevent a defendant from profiting from its wrongful conduct. Finally, in Mathias, the court looked at whether a defendant's wealth enables it to mount an extremely aggressive defense, making litigation too costly for a plaintiff and making it difficult for a plaintiff to find a lawyer willing to take a case. Obviously, there was a lawyer willing to take the case here, and that was me. But it doesn't mean that the defendant didn't use their wealth to hire a large law firm to litigate this case for over five years. It's exactly the fact, pattern, and scenario that the Mathias court, which was adopted by the Illinois Supreme Court, had warned that we need to protect. We need to protect against this. We need to tell large corporations, when you do bad things and you're far liable, which they were here, the jury found that they were bad actors, and that's why the jury entered a large punitive damage award against Mr. Hefter, which I will submit... You need to feel Wells Fargo's decision to pay the punitives, the remitter. Well, so once the judge entered remitter at the trial court, my options as the plaintiff were to reject the remitter. This is by law. If I rejected the remitter, which I could have done, I get a new trial on damages only. How am I going to do better than I already did? I don't want a new trial on damages. I'm not getting more than $25 million against Wells Fargo. So my only other option was to reject it or to do nothing. I didn't have the option of appealing the remitter on Wells Fargo. They had the option of settling or paying. So we resolved the matter with Wells Fargo, but if I had the ability to appeal the remitter on Wells, I would have done it. I didn't have the ability under the law. That's just how remitter works. So there was no choice. Unlike this situation, Mr. Hefter, again, not willing to own up to his actions, using his money to fight, decides to file an appeal, which he has every legal right to do. I'm not saying he should be punished for appealing a case, but he still, to this day, to this minute, to 10 minutes ago, he's trying to defend his conduct, which is indefensible. So that's why you were able to appeal when he appealed. Correct. Since he appealed, I was able, under the law, I was then able to cross-appeal the decision for the trial court to remit, which is why I did. And I'm asking the court to reinstate the original punitive damage award against Hefter, which is, at worst for him, half of one year's salary based on a stipulation that he earns at least $5 million a year, and his net worth is at least $25 million. So how much money is enough to, quote, sting, which is what Posner said in Matthias. He said there's got to be enough money so that it stings, so that they won't do it again, and other bad actors in society won't do it. Anything further? Justice Burkett. Mr. Dell, thank you so much for your time. Thank you. And, Ms. Konorowski, thank you for your time. We'll take the case under advisement and render a decision in due course.